THE PEOPLE OF STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANK OBROCHTA *et al.*, Defendants-Appellants.

Second District   Nos. 85—0556, 85—0660 cons.

Opinion filed November 18, 1986.

946

LINDBERG, J., dissenting in part.

Joseph T. Stillo, of Stillo & DeMeo, and Anthony Pinelli, both of Chicago, for appellants.

Fred L. Foreman, State's Attorney, of Waukegan (Kenneth R. Boyle, of State's Attorneys Appellate Prosecutor's Office, of Springfield, and William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of Elgin, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendants, Frank Obrochta and Paul Koroluk, were charged by indictment with the offenses of burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)), possession of burglary tools (Ill. Rev. Stat. 1985, ch. 38, par. 19—2(a)), and theft exceeding $300 (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(a)(1)). Following a jury trial, Obrochta was found guilty of all three offenses, and Koroluk was found guilty of burglary and possession of burglary tools. The trial court had previously directed a finding of not guilty for Koroluk on the theft charge and had directed findings of not guilty for a codefendant, Richard Zuniga, on all charges against him. Obrochta was sentenced to a five-year term of imprisonment for burglary, and Koroluk was sentenced to a two-year term of probation for burglary. The record reveals that no sentences were imposed on the judgments entered on the remaining jury verdicts against both defendants as these were dismissed as lesser included offenses.

The defendants bring this consolidated appeal and raise the following issues: (1) that both defendants were not proved guilty beyond a reasonable doubt of burglary; (2) that defendant Obrochta was not proved guilty beyond a reasonable doubt of theft; (3) that defendant

Koroluk was not proved guilty beyond a reasonable doubt of possession of burglary tools; and (4) that evidence of a radio scanner being found during the arrest of Obrochta which was not admitted into evidence and was stricken by the trial court was still heard by the jury and denied both defendants a fair trial.

The State's evidence reveals that at 12:30 p.m. on March 11, 1985, Cindy Levy saw a car pull into the driveway of her home, which is located in an isolated cul-de-sac in Bannockburn. A man, whom she later identified as defendant Obrochta, rang the doorbell and asked for directions to Wilmot Road. Being suspicious, Levy called the police to report the occurrence, describing the car to Chief of Police Thomas Potter and providing a partial license-plate description. She testified that there were three or four men in the car.

After receiving Levy's telephone call, Bannockburn police chief Potter looked out his office window and saw a car coming from the direction of Levy's house, which is about two-tenths of a mile from his office, that he believed matched the description. Potter followed the car in his squad car, losing sight of it for only a brief time. He spotted the car again driving toward him on a no-outlet road. He pulled alongside and asked the driver what he was doing. The driver asked for directions to Telegraph Road, and Potter asked him to pull over. Potter testified that he believed there were four men in the car. The car accelerated and fled while Potter was making a radio report and pulling over to the side of the road. He pursued the car into Deerfield. After losing sight of the car for a few seconds, he saw the car pulling away from a curb. Potter proceeded to stop the car. Zuniga, the driver and only occupant of the car at this time, denied that other people had been in the car and stated that he had fled because he did not think he had a driver's license. Potter radioed police departments in other communities, including Deerfield, that three subjects had fled the car.

At approximately 1:30 p.m. that afternoon, Ingrid Kube looked out of her family-room patio doors in Deerfield and saw a man, whom she later identified as the defendant Koroluk, standing at the side door of her unattached garage about 10 to 12 feet away. Kube asked Koroluk what he was doing, and through the closed patio doors, it appeared he mouthed the word "nothing." She noticed that he talked into the garage and that the side door of the garage was slightly open. Obrochta, whom she later identified as the second man, stepped out through the garage door, and both men ran away, giving her a chance to observe the side of Obrochta's face. Kube then called the police. She described one white male, Koroluk, as being approximately 200 pounds and wearing a black jacket. She described another white

male, Obrochta, as being approximately 145 pounds, wearing a blue jacket and jeans and clutching a blue tote or athletic bag to his chest. Her garage door was closed, and the side door had also been closed but not locked. The garage contained tools and bicycles. Nothing was taken from the garage.

After receiving Kube's call, Deerfield police officer David Ebert went to Kube's home, interviewed Kube, and received a description of the two men. He put out a radio broadcast to other Deerfield police officers to look for the two subjects. He then received a broadcast from Officer Kenneth Anderson that he had seen the two suspects running through the front yard of a home on an adjacent street. Ebert drove there and saw Anderson chasing the two suspects on foot. Ebert then pursued the man in the blue jacket, who was carrying a blue bag and whom Ebert identified as Obrochta. He saw the other person, Koroluk, throw gloves on the roof of a house. Ebert lost sight of Obrochta during this pursuit. When Ebert saw him again, Obrochta was not carrying any bag. He again lost sight of Obrochta. Mr. Blevins, a resident of the neighborhood, then led Ebert to his yard where Ebert found Obrochta in the storage shed behind the home. Later, a scanner radio receiver was found inside the shed which was turned to the Deerfield police department frequency.

Officer Anderson testified that in responding to Ebert's radio call, he saw two subjects running between houses in the area of the Kube home. Both persons were carrying something. He chased the one, later identified by him as Koroluk, and took him into custody. He recovered gloves on a roof immediately adjacent to where he arrested Koroluk. Anderson then retraced the route which Obrochta had run and found a blue gym bag containing, among other things, walkie-talkies, a radio-frequency book, two screwdrivers, several pairs of pliers, several pairs of gloves, spray lubricant, a lock pick, and a lock cylinder drill. The two walkie-talkies were Motorola Model MT-500 portable two-way radios. A forensic scientist for the Northern Illinois Police Crime Laboratory testified that a fingerprint on a page of the radio-frequency book found in the blue gym bag discarded by Obrochta compared with that of the left index finger of Koroluk.

A State witness, Frank W. Hauser, stadium manager of Soldier Field, testified that on June 3, 1984, 10 Motorola two-way radios were discovered to be missing from his office in Soldier Field in Chicago. He identified the two Motorola two-way radios found in the blue gym bag as two of the missing radios. Neither defendant offered any evidence in his defense.

■ The defendants' first contention is that the State failed to

prove them guilty beyond a reasonable doubt of burglary. Essentially, Koroluk argues that there was no proof that he ever entered the garage, and both the defendants maintain that there is no proof that the entry made by Obrochta was with the intent to commit a burglary. Instead, they point out that it is obvious that Obrochta entered the garage to hide from the police and nothing therein was disturbed or taken. They contend that a case such as this, based upon circumstantial evidence, must be of such a nature as to exclude any reasonable hypothesis of innocence. The State responds by arguing that the intent to commit a theft may be shown by circumstantial evidence and the fact that Koroluk was standing outside the garage in plain view shows that he was a lookout and is inconsistent with the claim that the garage was used as a hiding place. Additionally, the State relies on the proof of the unlawful entry as an inference of guilt sufficient to sustain a conviction for burglary. The State also maintains that the defendants' flight from the garage shows a consciousness of guilt.

The burglary statute requires an entry or a remaining within a building without authority with the intent to commit a felony or theft. (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a); *People v. Weaver* (1968), 41 Ill. 2d 434, 438-39, 243 N.E.2d 245; *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 134, 476 N.E.2d 1179.) The intent to commit a felony or theft ordinarily may be established circumstantially (*People v. Davis* (1982), 106 Ill. App. 3d 260, 267, 435 N.E.2d 838); however, the felonious intent must still be proved beyond a reasonable doubt (*In re Velez* (1979), 75 Ill. App. 3d 399, 400, 394 N.E.2d 525). In the absence of inconsistent circumstances, proof of unlawful breaking and entering is sufficient to infer the intent to commit theft. *People v. Toolate* (1984), 101 Ill. 2d 301, 308, 461 N.E.2d 987.

■ We believe that under the particular facts present here, the State has failed to prove the requisite intent to commit a theft inside the Kube garage as charged. The circumstances preceding Obrochta's entry into the garage and Koroluk's presence outside the garage are inconsistent with an intent to commit theft and are insufficient to infer such an intent. While the evidence may indicate that the defendants may have intended to commit a burglary earlier that afternoon, as shown by their possession of burglary tools and sophisticated communication and detection equipment along with the apparent "casing" of the Levy home in Bannockburn, the State has not shown the requisite intent to commit a burglary of the Kube garage in nearby Deerfield.

It is evident that at approximately 12:30 p.m., once Bannockburn police chief Potter began following the vehicle described to him by

Mrs. Levy, who saw Obrochta enter the car after leaving her house, any immediate plans for a burglary went awry. The car sped away after it had been briefly pulled over. A chase began which led to the community of Deerfield. During the chase, the car temporarily eluded Chief Potter, and, once pulled to the curb, the other three occupants had fled, leaving only the driver, Zuniga. A short while later, at approximately 1:30 p.m., Mrs. Kube observed Koroluk standing at the side door of her garage. Once noticed, Koroluk called to Obrochta, who was inside the garage, and both fled. Nothing was taken from the garage, nor did the State offer evidence that anything inside had been disturbed.

As to Obrochta, his mere presence in the garage, in the light of the facts referred to above, is inconsistent with a felonious intent to enter the garage to commit a theft. The evidence shows he is one of those who had fled the vehicle during the chase by the police. Only a short time had elapsed between the time he was seen at the Levy house at 12:30 and when, following the chase, he was observed by Kube at 1:30 p.m. It is unreasonable to infer that he formed an intent to commit a burglary, let alone a garage burglary, while running on foot from the police in a neighboring community. He was without a vehicle to transport anything he might have taken from the garage, and, in fact, nothing was taken from the garage or disturbed therein.

The State and the dissent, however, believe that the jury may have inferred that Koroluk was standing outside the garage as a lookout and this shows Obrochta was not hiding or fleeing. This inference is unreasonable and inconsistent with all the other evidence. As we have stated, the evidence shows Obrochta had been in the vehicle, and it is evident that he was fleeing the police with other persons. The fact that he and Koroluk were together at the Kube garage and both fled that place strongly suggests that they were together earlier in the car. Other evidence links them together. The blue bag Obrochta was carrying contained a radio-frequency book in which Koroluk's fingerprint was found. Thus, rather than inferring that Koroluk, standing outside in plain view in midafternoon, was a "lookout" for a suddenly planned garage burglary, it is far more consistent with the evidence that Koroluk had also been inside the garage and had stepped outside to determine if the police were present. A sufficient time had elapsed since the chase began, shortly after 12:30 p.m., and 1:30 p.m., when Kube saw them, so that it was reasonable for Koroluk to have exposed himself to determine if the police were around. That the two then fled once discovered by Kube creates no inference of guilt relating to an intent to commit a burglary, but is entirely con-

sistent with their effort to escape from the police or anyone else who might discover them.

■ A finding of guilty will be disturbed only where the evidence is so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. (*People v. Kline* (1982), 92 Ill. 2d 490, 506, 442 N.E.2d 154.) It is our duty, where a verdict of guilty is returned by a jury, not only to carefully consider the evidence, but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged. (*People v. Bartall* (1983), 98 Ill. 2d 294, 305-06, 456 N.E.2d 59.) Based upon the facts related above, the State failed to prove that Obrochta's entry into the garage was with the intent to commit a theft therein, and we must reverse his burglary conviction. Similarly, the evidence against Koroluk, which is based on his being an accomplice of Obrochta, fails as well, and we must reverse his burglary conviction.

■ Even though the trial judge only sentenced the defendants upon the guilty verdicts for the offense of burglary, Obrochta has challenged on appeal his conviction for theft, and Koroluk has challenged on appeal his conviction for possession of burglary tools. Both defendants claim they were not proved guilty beyond a reasonable doubt. The common law record indicates that no sentences were imposed on these two convictions and they were dismissed as "lesser included offenses." As the defendants have sought reversal of these convictions despite the lack of imposition of sentences, we shall examine the merits of their contentions and, if the convictions are affirmed, remand the cause for imposition of sentence. *People v. Scott* (1977), 69 Ill. 2d 85, 89, 370 N.E.2d 540; see *People v. Dixon* (1982), 91 Ill. 2d 346, 353-54, 438 N.E.2d 180.

■ We address first Koroluk's contention that his conviction for possession of burglary tools must be reversed because he was not proved guilty beyond a reasonable doubt. More specifically, he claims that there is no evidence that he ever possessed the blue bag which contained the burglary tools. Although his fingerprint was identified as being on a page of a radio-frequency book contained inside the blue bag, Koroluk contends this evidence is only circumstantial, the radio-frequency book is not a burglary tool, and the fingerprint evidence does not prove anything with respect to the burglary tools also found in the bag. The State responds that Koroluk may be found guilty of possession of burglary tools under an accountability theory for the conduct of Obrochta who, the State argues, did possess the blue bag containing the burglary tools. In a one-sentence statement, without ci-

tation of authority, the State also asserts Koroluk was in constructive possession of the burglary tools.

To sustain a conviction for possession of burglary tools the prosecution must prove (1) that the tools are adapted and designed for breaking and entering, (2) that defendant possessed them with knowledge of their character, and (3) that he intended to use them for breaking and entering. (*People v. Faginkrantz* (1960), 21 Ill. 2d 75, 79, 171 N.E.2d 5; *People v. Ruberto* (1980), 81 Ill. App. 3d 636, 640, 401 N.E.2d 1306.) The required intent is a general intent to use the tools for a criminal purpose and may be inferred from the circumstances accompanying their possession. (*People v. Esposito* (1959), 18 Ill. 2d 104, 107, 163 N.E.2d 487.) The question before us, however, is whether under the facts present Koroluk, who at no time was shown by the evidence to have possessed the bag containing burglary tools, either was in constructive possession of the tools or is legally accountable for Obrochta's possession of the tools.

■ The State has not cited any authority to support the theory that, in a possession-of-burglary-tools prosecution, an accused never shown to have been in possession of the tools may be legally accountable pursuant to section 5—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 5—2) for the conduct of another who is shown to possess burglary tools. The only Illinois authority we have found where such a theory was found to be justified is inapposite factually. In *People v. Taglia* (1979), 76 Ill. App. 3d 199, 392 N.E.2d 725, numerous burglary tools were found on the defendant, on a codefendant, and in the trunk of the defendant's vehicle. Other tools belonging to the codefendant which had been thrown from the vehicle were also recovered. The defendant was charged with possession of all the burglary tools, and an accountability instruction was given. The narrow holding of the appellate court was that "in a case such as this, where the items possessed belong to more than one codefendant, an accountability instruction may be proper." (76 Ill. App. 3d 199, 204, 392 N.E.2d 725.) We do not find this case to be applicable under the facts of the case at hand.

All the witnesses who saw Koroluk and Obrochta running from Mrs. Kube's garage and later fleeing from the police testified that only Obrochta carried the blue bag later determined to contain burglary tools. None of the tools were shown to have been owned or possessed by Koroluk. Although Koroluk's fingerprint was identified as being on a page in a radio-frequency book, this book is not a burglary tool; nor was there any evidence as to when the fingerprint was placed on the page. Thus, there is no evidence of Koroluk's possession

of the burglary tools. While the evidence may show inferentially that Koroluk knew that the bag Obrochta was carrying contained burglary tools, to be legally accountable for Obrochta's conduct, Koroluk must aid or abet Obrochta in the planning or commission of the offense of possession of burglary tools. This evidence is completely lacking. Although the State has also briefly asserted without citation of authority that Koroluk was in constructive possession of the burglary tools, there is no proof that Koroluk ever had control over the tools either in his home, the vehicle, or other place which he controlled where this doctrine is usually applied. See *People v. Roundtree* (1985), 135 Ill. App. 3d 1075, 1080-81, 482 N.E.2d 693.

For the foregoing reasons, Koroluk cannot be convicted of possession of burglary tools. As the judgment entered on the guilty verdict was already dismissed, even though for a different reason, we need not enter any further order on this issue except to reverse this conviction.

We turn next to Obrochta's contention that his conviction for theft must be reversed because he was not proved guilty beyond a reasonable doubt. The count of the indictment for theft involved the allegation that he gained unauthorized control over two two-way portable radios belonging to the Chicago park district intending to deprive it permanently of the use of the property in violation of section 16— 1(a)(1) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 16— 1(a)(1)). Defendant first argues that the record is devoid of any evidence that the radios were the property of the Chicago park district. This argument is meritless. Frank Hauser testified that he was the stadium manager of Soldier Field in Chicago and that the two radios, which had the name of an employee of his on each of the radios, were those missing from his office on June 3, 1984. He further testified that the radios were set to the frequency assigned to the Chicago park district and used by the district. Absent any proof to the contrary, we find that this evidence sufficiently shows ownership in the Chicago park district. Moreover, any arguable variance between the allegations and proof is neither material nor misleading to defendant's prejudice. See *People v. Bohm* (1983), 95 Ill. 2d 435, 439, 448 N.E.2d 175.

Obrochta's second contention relating to his theft conviction is that his possession of the radios almost a year after they were reported missing "is not enough to prove theft by recent possession" and that a "conclusive inference that Obrochta stole the radios cannot be supportive."

Obrochta was charged pursuant to section 16—1(a)(1) in that on

March 11, 1985, he "gained unauthorized control" over the two radios. When a defendant is charged under section 16—1(a), which provides the means of accomplishing the prescribed conduct of unauthorized control in terms of "obtains or exerts," the use of either word is descriptive of the same conduct. (*People v. Soskins* (1984), 128 Ill. App. 3d 564, 570-71, 470 N.E.2d 643.) Thus, as contained in the definitional article of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 15—1 *et seq.*), the phrase "obtains or exerts control" over property, as used in the theft statute, is defined as including, but not limited to, "the taking, carrying away, *** or possession of property." (Ill. Rev. Stat. 1985, ch. 38, par. 15—8; *People v. Soskins* (1984), 128 Ill. App. 3d 564, 570-71, 470 N.E.2d 643.) It is clear under the allegations and the proof that Obrochta was being charged with unauthorized possession of the two radios on March 11, 1985, the date he was observed by Deerfield police in possession of the bag containing the radios.

■ The argument raised by Obrochta that the theft of the radios from the Chicago park district was not recent and cannot support the inference that he stole the radios is irrelevant here. The applicability of the inference arising from an accused's exclusive possession of recently stolen property is not involved here where we are not concerned with the initial taking of the property in question, but rather the subsequent unauthorized possession of the property by defendant. *People v. Mertens* (1979), 77 Ill. App. 3d 791, 796, 396 N.E.2d 595; *People v. Nunn* (1965), 63 Ill. App. 2d 465, 470-71, 212 N.E.2d 342; *cf. People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151.

On appeal Obrochta has not presented any other argument to support his contention that his guilt was not proved beyond a reasonable doubt. We conclude, therefore, that Obrochta's unauthorized possession of the two radios under the circumstances here is sufficient to show Obrochta intended to permanently deprive the owner of the radios. Obrochta fled from the police when chased and attempted to dispose of the bag containing the radios and burglary tools while being pursued. He offered no evidence at trial to explain the circumstances of his possession of the radios or intentions. The theft was proved beyond a reasonable doubt.

■ The final contention raised by both defendants is that they were denied a fair trial. In this regard, the defendants maintain that although a radio scanner found in the shed where Obrochta was arrested and testimony concerning its discovery was introduced into evidence, the testimony was later denied admission into evidence. The defendants argue that even though the jury was specifically admon-

ished by the trial judge that this evidence was not admissible and should not be considered by them in arriving at their verdict, they still were prejudiced and the instruction did not cure this error.

We need not reach the merits of this contention because the defendants failed to raise this issue in their motions for a new trial, and the contention is properly deemed waived. (*People v. Wright* (1985), 111 Ill. 2d 128, 153-55, 490 N.E.2d 640.) Moreover, we believe the instruction to the jury cured any error considering the other evidence against the defendants. See *People v. Bartall* (1983), 98 Ill. 2d 294, 317, 456 N.E.2d 59.

For the foregoing reasons, we remand Obrochta's theft conviction for sentencing in accordance with *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540. We also remand for sentencing Obrochta's conviction for possession of burglary tools as no sentence was imposed upon this unappealed conviction which was intimately related to and dependent upon the appealed conviction of burglary, which we have reversed, within the meaning of Supreme Court Rule 615(b)(2) (87 Ill. 2d R. 615(b)(2)). (See *People v. Dixon* (1982), 91 Ill. 2d 346, 353-54, 438 N.E.2d 180.) Both defendants' burglary convictions are reversed, and Koroluk's possession-of-burglary-tools conviction is reversed.

Reversed in part and affirmed in part and remanded.

HOPF, J., concurs.

JUSTICE LINDBERG, dissenting in part:
I dissent from that part of the majority's holding which reversed defendants' convictions for burglary. I believe that the jury was entitled to conclude from the evidence that defendant Obrochta was engaged in a burglary just before being observed by Mrs. Kube running from her garage after she had inquired of Koroluk what he was doing outside her garage door. Koroluk's conviction of burglary would then be on the theory of accountability discussed in the majority opinion.

On the record in this case the jury was entitled to consider that: there was no evidence that defendants knew upon leaving Zuniga's car that they were being pursued, having outrun Chief Potter and having departed Zuniga's car apparently without detection; defendants' theory of innocence, hiding from the police rather than committing a burglary, was belied by the presence of one of the defendants at Mrs. Kube's garage door standing in open view since, by definition, persons hiding do not stand in open view; having a person stand as a lookout while a burglary was being committed is consistent with the

jury's conclusion that a burglary was being committed; when they were observed by Mrs. Kube, defendants had not abandoned their burglary tools, as would persons who thought they were in imminent danger of apprehension; and Obrochta's discarding of the satchel of burglary tools when he knew he was in imminent danger of detection and apprehension by Officer Ebert reinforces the conclusion that defendants were not hiding in the Kube garage, but, rather, they entered the garage without authority and in possession of burglary tools to commit a theft therein. Therefore, I would affirm the jury's verdict finding defendants guilty of burglary.