THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH D. WALN, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SCOTT RHOADES, Defendant-Appellant.

Fifth District    Nos. 5—86—0581, 5—86—0621 cons.

Opinion filed May 16, 1988.

Daniel D. Yuhas, Lawrence J. Essig, and Allen H. Andrews, all of State Appellate Defender's Office, of Springfield, for appellants.

Dennis Doyle, State's Attorney, of Waterloo (Kenneth R. Boyle, Stephen E. Norris, and Wendy B. Porter, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendants, Keith Waln and Scott Rhoades, were charged in the circuit court of Monroe County with possession of burglary tools. Waln was also charged with solicitation to commit burglary. A codefendant, Terry Bass, was charged with Waln and Rhoades; however, his case was severed. Waln and Rhoades were tried before a jury and found guilty of possessing burglary tools. Waln was acquitted of solicitation. Defendants brought separate appeals which have been consolidated for review.

At trial, Kevin Sweet, a deputy sheriff of Monroe County, testified that he was on patrol at approximately 9 p.m. on May 5, 1986, when he observed a van with an inoperative license plate light. As Sweet was running a license plate check on the van, it turned, and as it did its left brake light and taillight went out. Sweet activated his lights and stopped the van.

Terry Bass was the driver of the van. Keith Waln was sitting in the front passenger seat and Scott Rhoades was sitting on a five-gallon bucket behind Bass and Waln.

As Sweet approached the van, he observed movement inside. Rhoades was bending over toward his left as if he were "hiding something in the van." Sweet shone his flashlight into the van, then checked the status of the driver's license Bass had produced. The check revealed that Bass' license had been suspended.

Sweet searched the van. In front of Waln, on the dashboard, he

found a stocking cap, and wedged between the dashboard and the passenger door, he found a screwdriver approximately 14 inches long. Sweet found a pair of brown gloves in the glovebox and a hand-held programmable radio scanner under Waln's seat. Behind the front seats there was a battery compartment, located in front of Rhoades and to his left. Sweet found a pair of gloves and a blue stocking cap near the compartment. He removed the "loose fitting" cover of the compartment and found two silver penlights inside. Upon initially stopping the van, Sweet had looked in the battery compartment and had noticed that the penlights were lying side by side. Later, during the course of the stop, after Bass had been removed from the vehicle, but while Waln and Rhoades were still in it, Sweet noticed that the penlights had been moved.

Bass was given a ticket for driving with a suspended license and was charged with possession of burglary tools. At the scene of the traffic stop, Bass claimed ownership of everything in the van except the radio scanner. Bass was later interviewed at the police station. In the course of that interview Bass stated that Waln and Rhoades had heard Sweet's radio transmission over Waln's scanner prior to the traffic stop.

Terry Bass testified regarding the events of May 5, 1986. Bass said no offers had been made to him in exchange for his testimony. He stated that he had never been convicted of a crime.

Bass testified that he first saw Rhoades at approximately 4:30 or 5 p.m. on May 5. Rhoades came to Bass' house in Cahokia, Illinois, looking for Bass' brother. Later, Keith Waln arrived. Waln offered Bass $200 to help him pick up a tractor. Bass reluctantly agreed. Bass, Waln and Rhoades got into Bass' van and headed west on Route 157. They eventually got onto Triple Lakes Road and headed toward Columbia. The three engaged in "idle conversation" about how Bass should fix his van. From Triple Lakes Road they turned onto Route 3, travelling toward Waterloo. Waln then instructed Bass to turn onto New Hanover Road.

Waln said their destination was on New Hanover Road. Waln and Rhoades mentioned that there was a "daykeeper" but no "night keeper." Waln said he had checked the mailbox and knew that no one had been picking up the mail. He instructed Bass regarding the procedure they would use when they reached the property. Waln and Rhoades said the tractor was in a barn on the property. Bass was to drop them off, go down the road, turn around, and return when they signaled with their penlights. Bass was then to stop and help them put the lawn tractor in the back of his van. When Bass became ner-

vous, Waln told him not to worry because he had a scanner in case someone called the police. Bass said it was then that he realized he was involved in a burglary.

Waln and Rhoades indicated that the house, with a white picket fence, would be "right around the next curve." At that point in time Bass noticed headlights behind the van. He heard a voice on the scanner saying "I will pull this guy over." Waln turned to Rhoades and told him to "stash everything." Bass then saw red lights on the top of the police car and, as Bass was pulling over to the side of the road, Waln took a long screwdriver and stuck it in the groove between the passenger door and the dashboard. Rhoades took gloves and penlights and hid them. The penlights, which had black tape around the ends when Bass first saw them, were later found in the battery compartment of the van. Bass said the scanner, penlights, screwdriver, stocking caps and brown gloves found in the van did not belong to him.

Bass testified that he was interviewed by Sheriff Daniel Kelley and Deputy Sweet after the the traffic stop and that he told them exactly what had happened. In that interview he described the house to be burglarized as it had been described to him. After Bass was interviewed his nose began to bleed. He admitted telling Rhoades that a police officer had hit him. He also admitted that he later told Rhoades he had told the police "a big fairy tale." Bass said he lied to Rhoades because he was afraid of being harassed by Waln or Rhoades. According to Bass, he was in fact later threatened by Waln's relatives.

Daniel Kelley, sheriff of Monroe County, testified that he interviewed Bass on May 5, 1986, on the night Bass was arrested. Bass gave a voluntary statement and was not harassed or coerced in any way. Bass told Kelley that the vacant house to be burglarized was supposed to have a white picket fence and a shed with a lawn tractor inside. Kelley later located such a house on New Hanover Road. There was no other house with a white picket fence in that area. Kelley found a John Deere riding mower in one of the outbuildings. Kelley testified that Waln's scanner was capable of receiving police frequency. He said the screwdriver found in the van could be used for prying. Kelley stated that in burglaries, the flashlights used by burglars are often taped around the top to keep the light beam from spreading out and being seen.

Kevin Sweet was recalled as a witness and testified that Bass had reported that he had been harassed and threatened because of the case.

Scott Rhoades testified that on May 5, 1986, Bass asked him to go for a ride in Bass' van to determine what repairs would be needed. Bass later asked Keith Waln about some body work. About 7:30 or 8 p.m., Bass, Waln, and Rhoades went for a ride in the van.

Waln brought a radio scanner into the van with him. The other items found in the van were in it when Waln and Rhoades got inside. Rhoades said they heard references to the van on the radio scanner and were aware that they were going to be stopped for some time before they were actually stopped. The only item in the van that was moved prior to the traffic stop was the scanner, which was put on the floor next to the passenger seat.

Rhoades said no one had offered Bass money to participate in a burglary and there had been no mention of picking up a lawn tractor or of an unoccupied house with a white picket fence. Rhoades stated that Waln carried a radio scanner wherever he went and that the scanner was monitoring Monroe County police frequency on the night the van was stopped. Rhoades said he did not know that the penlights were in the van and he did not move them.

Daniel Kelley was recalled as a witness and testified that on May 5, 1986, Rhoades had indicated that his fingerprints might be on the penlights. Gene Henckler, an officer with the Columbia police department, testified that he spoke with Rhoades on May 6, 1986, at which time Rhoades stated that Waln and Bass had talked about a lawn mower the previous evening.

Following closing arguments the jury was instructed in the applicable law. Included in the charge to the jury was an accountability instruction which was given over defense objections. The jury subsequently found Waln and Rhoades guilty of possessing burglary tools. Waln was acquitted on the solicitation charge.

On August 15, 1986, Rhoades was sentenced to a 30-month term of probation. He was to spend 30 days in the county jail with credit for time served and was ordered to obtain his general equivalency diploma within 12 months. The court stated that it was "quite certain, that [Rhoades] lied in his testimony during trial."

Waln was sentenced on July 25, 1986. In mitigation, the court found that Waln's conduct neither caused nor threatened serious physical harm to another, and that he did not contemplate that his conduct would cause physical harm. In aggravation, the court found that Waln had a prior history of criminal activity and that a sentence of imprisonment was necessary to deter others. The court noted that Waln had been convicted of a felony of the same class within 10 years. Prior to pronouncing sentence the court stated:

"Mr. Waln, I've mulled over this matter for more than a few hours trying to find a way that I would keep you out of the penitentiary with the hope of rehabilitating you. I thought of intensive probation for the longest period of time, but for the life of me, I can't see how anyone who has been on probation and commits an offense like you did on your own parole how I can—that it's likely that you would comply with the conditions of probation, and that's the finding that I would have to make."

The court found that Waln was not likely to comply with conditions of probation. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1(10).) The court stated its belief that Waln lacked rehabilitative potential and that a prison sentence would at least prevent Waln from committing another offense. The court sentenced Waln to the maximum extended-term sentence of six years in the Illinois Department of Corrections.

On appeal, both Waln and Rhoades contend that they were not proved guilty beyond a reasonable doubt, due to the unreliable testimony of Terry Bass. In addition, Rhoades notes that there was no evidence that he possessed the burglary tool upon which the charge was based and that it was error to instruct the jury that he could be found guilty based upon a theory of accountability. Both defendants claim that they were denied effective assistance of counsel because their attorneys failed to argue that Bass' prior inconsistent statements could be considered as substantive evidence. Finally, Waln challenges his sentence, arguing that the court improperly gave controlling weight to a single aggravating factor.

■■ ■ We find the evidence sufficient to prove defendants guilty beyond a reasonable doubt. Terry Bass' testimony, when considered in conjunction with that of the police officers, established the elements of the offense as to each defendant and was credible, convincing and corroborated.

To sustain a conviction for possession of burglary tools the prosecution must prove (1) that the tools are adapted and designed for breaking and entering, (2) that defendants possessed them with knowledge of their character, and (3) that they intended to use them for breaking and entering. (*People v. Rodriquez* (1987), 153 Ill. App. 3d 652, 505 N.E.2d 1314.) Tools originally designed and intended for an innocent purpose may nonetheless be considered burglary tools where they are suitable for use in a burglary and are intended for such a use. *People v. Faginkrantz* (1960), 21 Ill. 2d 75, 171 N.E.2d 5; *People v. Clerk* (1979), 68 Ill. App. 3d 1021, 386 N.E.2d 630.

Defendants were charged with possessing a screwdriver with the intent to use it in a burglary. Terry Bass testified that Waln offered him $200 to pick up a lawn tractor with his van. En route to get the tractor, Waln and Rhoades mentioned that there was only a "day-keeper" at the premises where the tractor was kept, that no one had been picking up the mail coming to that address, and that there was no need to worry because Waln had a radio scanner in case someone called the police. Waln instructed Bass that he was to drop them off when they reached the property—a house with a white picket fence—and return when they signaled with their penlights. The statements attributed to Waln and Rhoades indicated that they intended to commit a burglary.

Bass stated that the brown gloves, stocking caps, scanner, screwdriver and penlights found in his van did not belong to him. Bass said he thought Rhoades had "all the gloves and stuff in his hands" when he first got into the van. Thereafter, he recalled that Waln had the scanner and screwdriver and that Rhoades had a pair of brown gloves and the penlights. The penlights had black tape wrapped around the lenses. Bass testified that, when they heard over the scanner that they were about to be stopped by the police, Waln told Rhoades to "stash everything." At that point Waln stuck the screwdriver in the groove between the door and the dashboard. Rhoades took gloves and penlights and hid them.

Deputy Sweet testified that Rhoades was bending down and reaching just after Sweet stopped the van and that the penlights found in the battery compartment of the van had been moved after he first saw them in the van and after Bass had been removed from the van. Sweet identified the items found in the van.

Sheriff Kelley testified that the screwdriver found in the van was suitable for prying and that penlights with taped ends are used in burglaries to limit the beam of light in order to make it less noticeable.

Bass' testimony was sufficient, if believed, to establish that Rhoades and Waln had the intent to commit a burglary and had brought certain items into the van with them for that purpose. Kelley's testimony established that the screwdriver specified in the charging instrument was suitable for use in a burglary. The other items found in the van—a radio scanner, gloves, stocking caps and taped penlights—were peculiarly suitable for use in a burglary, thus adding weight to the inference that Waln and Rhoades intended to use the screwdriver in a burglary.

■ Both Rhoades and Waln argue that in addition to being an

accomplice witness, whose testimony is subject to suspicion (see *People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375), Bass' trial testimony was contradicted by his inconsistent pretrial statements. Therefore, they contend, Bass' testimony is insufficient to support their convictions. We disagree.

Although Bass may not technically be an accomplice, he is in a position similar to that of an accomplice and his uncorroborated testimony must be viewed with caution. (*In re Brown* (1978), 71 Ill. 2d 151, 374 N.E.2d 209.) However, even the uncorroborated testimony of an accomplice is sufficient to sustain a conviction if it convinces the jury of defendants' guilt beyond a reasonable doubt. (*Newell*, 103 Ill. 2d at 469-70, 469 N.E.2d at 1377.) In this case there was corroboration of Bass' claim that Rhoades and Waln had brought items into his van to be used in a burglary and that they did in fact intend to commit a burglary. The character of the items tends to corroborate Bass' story. Granted, they were lawful to posses and perhaps innocent under other circumstances. However, under the circumstances of the case at bar possession of the items was corroborative. Waln had a police scanner with which he was monitoring Monroe County police frequency. The screwdriver was found stuck between the dashboard and the door on Waln's side of the van. A stocking cap was found on the dashboard in front of Waln, and one was found near Rhoades. Penlights were found in a battery compartment near Rhoades. Officer Sweet saw Rhoades bending down in the direction of that compartment as he approached Bass' van. Rhoades told Sheriff Kelley that his fingerprints might be on the penlights. The foregoing evidence constitutes material corroboration of Bass' testimony. Material corroboration of accomplice testimony is entitled to great weight. *People v. Green* (1984), 125 Ill. App. 3d 734, 466 N.E.2d 630.

■ Whether corroborated or uncorroborated, where accomplice testimony has satisfied the jury that defendants are guilty beyond a reasonable doubt, we as a court of review should not disturb the jury's verdict unless it is plainly apparent that the necessary degree of proof is lacking. (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207.) A finding of guilty by the trier of fact will not be disturbed on review unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Crawford* (1987), 152 Ill. App. 3d 992, 505 N.E.2d 394.) The necessary degree of proof is present in this case if Bass' testimony is considered credible. Determining credibility of witnesses and the weight to be accorded their testimony is a function reserved primarily for the trier

of fact, and a court of review will not normally substitute its own judgment in that regard. (*People v. Locascio* (1985), 106 Ill. 2d 529, 478 N.E.2d 1358.) It is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 493 N.E.2d 600.

The jury viewed the demeanor of the witnesses as they testified. The jury was aware that Bass had given statements prior to trial that were inconsistent with his trial testimony and it heard his explanations for having given prior inconsistent statements. The jury viewed Rhoades as he testified, refuting Bass' testimony, and it was aware that he too had given at least one statement that conflicted with his trial testimony. Resolving conflicts in the testimony was a task for the jury. The jurors were in a better position to resolve conflicts than are we. We note that at sentencing the trial court, having heard the testimony and viewed the witnesses as they testified, expressed its belief that Rhoades lied when he testified at trial. We see no reason to disturb the jury's finding as to credibility.

Rhoades argues that there was no testimony that he ever possessed the burglary tool (screwdriver) charged in the information; therefore, he cannot be found guilty of having possessed it and the jury should not have been instructed that he could be held accountable for Waln's possession. Rhoades cites *People v. Obrochta* (1986), 149 Ill. App. 3d 944, 500 N.E.2d 1059, in support of his contention.

In *Obrochta*, defendants, Koroluk and Obrochta, were seen running from a garage and fleeing from the police. Obrochta carried a blue bag later determined to contain burglary tools. None of the tools were shown to have been owned or possessed by Koroluk. In *Obrochta*, the appellate court held that the evidence was insufficient to support a conviction of Koroluk for possession of burglary tools, stating:

> "While the evidence may show inferentially that Koroluk knew that the bag Obrochta was carrying contained burglary tools, to be legally accountable for Obrochta's conduct, Koroluk must aid or abet Obrochta in the planning or commission of the offense of possession of burglary tools." (149 Ill. App. 3d at 953, 500 N.E.2d at 1064.)

The *Obrochta* decision appears to be premised on the court's finding that the defendants lacked the required intent to burglarize the garage from which they were seen running. Therefore, *Obrochta* can be distinguished from the instant case, in that Rhoades *was* shown to have the intent to commit a burglary. However, if *Obrochta*

stands for the proposition that one cannot be held accountable for another's possession of burglary tools unless he aids or abets another "in the planning or commission of the offense of possession of burglary tools" (149 Ill. App. 3d at 953, 500 N.E.2d at 1064), then we must disagree with *Obrochta's* overlybroad language.

Section 5—2(c) of the Criminal Code of 1961 states:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c).)

Section 5—2(c) incorporates the "common design rule." (*People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, 749; *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 655, 493 N.E.2d 135, 141.) In view of the "common design rule," the State need only prove that a defendant had the specific intent to promote or facilitate a crime, and not the actual crime for which he was charged. Once the State proves that a defendant intended to promote or facilitate *a* crime, he is responsible for *any* criminal act done in furtherance of the intended crime. (*Miscichowski*, 143 Ill. App. 3d at 655, 493 N.E.2d at 141.) Therefore, where, as here, Rhoades was shown to have intended to promote, facilitate, or participate in a burglary, he can be held accountable for Waln's possession of burglary tools to be used in furtherance of the burglary. To the extent that *Obrochta* may hold otherwise, we disagree. Rhoades was properly held accountable for Waln's possession of the screwdriver even if he did not physically possess it. Obviously, in view of our holding the giving of an accountability instruction was proper.

Defendants next contend that they were rendered ineffective assistance of counsel in that their attorneys failed to use Bass' prior inconsistent statements substantively at trial pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1). Additionally, Waln contends that Rhoades' prior inconsistent statement was not admissible as substantive evidence pursuant to section 115—10.1; therefore, his attorney was also ineffective for failing to have the jury instructed that Rhoades' prior inconsistent statement could only be considered for impeachment.

In order to prove ineffective assistance of counsel, defendants

must demonstrate both that their attorneys failed to perform as reasonably competent attorneys and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) As to Bass' prior inconsistent statements, we see no error in counsel's treatment of them. While it is true that defense counsel argued that they impeached Bass' testimony at trial, counsel did not ask for a limiting instruction during elicitation of testimony or submit such instruction for the jury's consideration. Such an instruction was tendered by defendant's attorney in *People v. Wilson* (1986), 149 Ill. App. 3d 1075, 501 N.E.2d 863, upon which both defendants rely. In *Wilson* the jury was instructed that prior inconsistent statements could be considered only for purposes of impeachment. Because of counsel's error, the court in *Wilson* held that defendant had been denied effective assistance of counsel. Since no limiting instruction was given in this case, the jury must have considered the evidence substantively, as any other piece of evidence. As for Rhoades' prior inconsistent statement, we agree that counsel for Waln should have sought a limiting instruction; however, given the other evidence adduced at trial we do not believe that there is a reasonable probability that the giving of such an instruction would have resulted in a different outcome.

■ Finally, Waln contends that he was "denied a fair sentencing hearing where the trial court felt compelled to impose the maximum extended term by improperly giving controlling weight to a singular aggravating factor." Based upon an isolated comment by the court during sentencing, defendant argues that the court improperly accorded controlling weight to a single aggravating factor.

We do not believe that the court felt it was *required* to impose an extended-term sentence; therefore, *People v. Frey* (1984), 126 Ill. App. 3d 484, 467 N.E.2d 302, upon which defendant relies, does not support his position. In *Frey*, we held that it was "obvious" that the court erroneously considered certain factors in arriving at its conclusion that an extended term was to be imposed. Moreover, we noted that

> "[t]he court apparently felt that since it found present one of the factors listed in section 5—5—3.2(b) [of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b))] it was required to impose the extended term sentence. The court did not of record consider the sentencing alternatives available under section 5—8—1. We believe this ought to have

been done." (126 Ill. App. 3d at 488, 467 N.E.2d at 305.) The instant case bears little if any similarity to *Frey*.

The court in this case did not rely upon improper factors in imposing an extended-term sentence; nor did it indicate that it felt it was required to sentence Waln to an extended term. The court stated during the sentencing hearing that it had considered the matter of an appropriate sentence for several hours and had considered intensive probation as a sentencing option. The record demonstrates that the court was not under the misapprehension that an extended term was required. The court realized it had discretion. Moreover, the record reveals that the court did consider mitigating factors in arriving at its sentence. To be sure, the court did appear to emphasize the fact that defendant was on parole when the offense was committed and that he had an extensive criminal history; however, sentencing by its nature requires that factors be weighed and that some be accorded greater significance than others. Sentencing requires that the court exercise its discretion in determining what factors are most important in arriving at an appropriate sentence.

The standard to be applied by a reviewing court is whether the trial court exercised its discretion and whether it abused that discretion in imposing sentence. (*People v. Jordan* (1985), 130 Ill. App. 3d 810, 474 N.E.2d 1283.) The sentence imposed is presumed to be proper, and only where such presumption has been rebutted by an affirmative showing of error will a reviewing court find the sentence to be an abuse of discretion. (*People v. Plantinga* (1985), 132 Ill. App. 3d 512, 477 N.E.2d 1299.) We find no abuse of discretion in the six-year extended-term sentence imposed in this case.

For the foregoing reasons, the judgment of the circuit court of Monroe County is affirmed.

Affirmed.

WELCH and CALVO, JJ., concur.